Tony R. JAKE, Petitioner–Appellant,

v.

G.L. HERSCHBERGER, Warden, ADX–Florence, Florence, Colorado, Respondent–Appellee.

No. 96–2780.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 11, 1999.

Decided April 6, 1999.

Tony R. Jake, White Deer, PA, pro se.

William E. Coonan, Mark R. Niemeyer (argued), Office of United States Attorney, Civil Division, Fairview Heights, IL, for Respondent–Appellee.

Robert J. Palmer, May, Oberfell & Lorber, South Bend, IN, for Amicus Curiae, pro se.

Before FAIRCHILD, MANION and KANNE, Circuit Judges.

MANION, Circuit Judge.

Federal prisoner Tony R. Jake appeals from the denial of his petition for habeas corpus under 28 U.S.C. § 2241 to correct his sentence. Jake seeks credit on his federal sentence for at least some of the time he was in state custody prior to his arrival at the federal penitentiary. Jake's sentence, which was imposed in 1984, is governed by statutory provisions which have since been repealed by the Sentencing Reform Act of 1984, P.L. 98–473. Jake first seeks credit for about four years of time he spent in the state prison after receiving a state sentence that was to be concurrent with his prior federal sentence. We agree with the district court that Jake is not entitled to credit for all the time he served after he received his concurrent state sentence. In the alternative, Jake seeks credit for about three years of time after he was offered by the state prison officials to the federal authorities, when the federal authorities declined to accept him. Again we agree with the district court that he is not entitled to credit for all this time. But we disagree with the district court that Jake was not entitled to credit for any time served prior to arriving at the federal penitentiary. We conclude, as did the magistrate judge, that Jake was entitled to credit for the time he was in state custody after his state sentence was stayed and he was ordered transferred to the federal authorities in accord with a previously lodged federal detainer—a period of about six months. We therefore reverse the district court's judgment denying Jake any relief and remand.

## Facts

Jake has a long history of committing violent felonies. On July 22, 1983, federal law enforcement officers in the Central District of California arrested Jake for his involvement in a bank robbery. He was indicted on August 8, 1983, and released on bond on August 19. While out on federal bond, on October 2, 1983, California law enforcement officers arrested Jake on kidnaping and rape charges. (Those charges were entirely unrelated to his pending federal charges.)

On October 24, 1983, Jake was arraigned in the federal district court. His appearance was obtained by a writ of habeas corpus ad prosequendum.[1] Jake pleaded not guilty to the charges, and the court scheduled a jury trial for November 22, 1983. This date was subsequently continued one week so his trial began on November 29. On that day he again appeared by means of a writ of habeas corpus ad prosequendum. After a four-day

---

1. This writ permits one sovereign—called the "receiving sovereign"—to "borrow" temporarily a person in the custody of another sovereign—called the "sending sovereign"—for the purpose of prosecuting him. It thus permits the receiving sovereign to perform such acts as indicting, arraigning, trying, and sentencing the person. *See Flick v. Blevins,* 887 F.2d 778, 781 (7th Cir.1989) *(per curiam).* Because the receiving sovereign merely obtains limited jurisdiction over the "borrowed" prisoner, the prisoner is still under the jurisdiction of the sending sovereign, and is considered to be in the custody of the sending sovereign not the receiving sovereign. *See id.*

trial, Jake was found guilty on December 2. On January 16, 1984, the district court sentenced Jake to 16 years imprisonment. (The federal judgment was silent as to its relation to any subsequent state sentence.) He was then returned to the state authorities. And on a date not disclosed in the record, the U.S. Marshal lodged a detainer for Jake with the state.

Jake entered into a plea agreement with the state prosecutor. He agreed to plead guilty to all five counts against him on two conditions: that his state sentence be concurrent with his federal sentence, and that he be permitted to serve his state sentence in any federal penitentiary. On June 10, 1985, Jake pleaded guilty under the terms of this agreement, and the state trial judge sentenced him to a 20–year sentence to run concurrently with his prior federal sentence. The judge ordered that he be turned over to the federal authorities, but due to a scrivener's error the wrong box was checked on his judgment of conviction so Jake was remanded to the California prison system and no attempt was then made to tender him to federal authorities.

On March 17, 1986, after a letter-writing campaign by Jake's family and attorney, the state trial court realized the error on the judgment and granted a writ coram nobis to correct it. The corrected judgment indicated that his state sentence was to be served in any federal penitentiary. In response, on April 10, 1986, state prison officials contacted the Federal Bureau of Prisons (BOP) and offered Jake to the BOP to serve his state sentence concurrently with his federal sentence in a federal prison. On May 21, 1986, the BOP responded that it would not accept Jake as offered. The BOP relied on a general rule that unless the federal judgment of conviction indicated that the sentence was to be concurrent with a state sentence, the BOP would not accept the prisoner until after

he had been released by the state. Of course this rule appears to be irrelevant in cases such as Jake's because the federal sentence preceded the state sentence—indeed, here the federal sentence preceded the state one by eighteen months. Obviously a federal judgment would make no reference to a state sentence that does not yet exist. But such a rule seems to have been recognized in the case law, including in this court. *See, e.g., United States v. Kanton,* 362 F.2d 178 (7th Cir.1966) *(per curiam).*[2]

Eight months later, on February 25, 1987, Jake's attorney contacted the systems administrator of the BOP's Western Region, seeking assurance that the BOP would credit Jake's time in state prison against his federal sentence. On March 4, the systems administrator responded, stating that Jake's federal sentence would not begin to run until he arrived in federal custody. The exact maneuvers in which Jake's attorney then engaged are unclear from the record, but their result became evident a little more than a year later.

In January 1988, Jake and another prisoner attacked several deputies, and he was charged with multiple counts of assault with a deadly weapon on a peace officer. On June 30, 1988, Jake pleaded guilty to one of the counts against him. He was sentenced to 5 years imprisonment to run concurrently with any uncompleted sentences. This sentence was stayed until September 23, 1988. On July 22, 1988, Jake pleaded guilty to another of the counts against him. He was sentenced to 9 years, again to run concurrently with any uncompleted sentences. This sentence was also stayed. At this same time, Jake's original guilty plea to the kidnaping and rape charges was set aside. Presumably this was done because the agreement that produced that plea—that he would

---

**2.** Moreover, a prisoner in Jake's situation could simply request the federal district court to alter its judgment to reflect that the state and federal sentences could be served concurrently. As is discussed below, Jake did not

take this step until August 1989, after he had already been taken into federal custody. A statute now governs these issues. *See* 18 U.S.C. § 3584.

serve a concurrent sentence in the federal penitentiary—had not yet been accomplished. Jake then pleaded guilty to these offenses again and was again sentenced to 20 years to run concurrently with his prior federal sentence. But this time the court did not err in executing its intention. The court also stayed this sentence until November 23, and ordered Jake into the custody of the Los Angeles County Sheriff with instructions to deliver him to federal authorities. The stays of Jake's various sentences were continued more than once because, for reasons that are unclear on the record, Jake was not "paroled" to the LA County Sheriff until December 15, 1988. The U.S. Marshal took physical custody of Jake on January 20, 1989. The BOP calculated Jake's sentence as beginning on December 15, 1988, the day he was paroled to the Sheriff.

About eight months later, Jake apparently attempted to have the federal district court either alter his original judgment of conviction or make a recommendation to the BOP regarding crediting his time served in state prison. On August 11, 1989, Jake filed a request for a stipulation with the district court. It is unclear precisely to what he requested a stipulation. On September 6, 1989, the district court— the same judge who had originally sentenced him—entered an order that seems to have denied Jake any requested relief. The order does not appear in the record, but the docket sheet describes it thus: "The Court does not believe that there is any basis on which to alter the federal sentence or to make any recommendation relating to the state sentence."

Jake also used the administrative procedures of the BOP in an effort to get credit for his time served in state prison. He exhausted those remedies sometime in 1991. On August 16, 1994, Jake filed the present petition for habeas corpus under 28 U.S.C. § 2241 seeking credit for his

time served in state prison.[3] This is the appropriate remedy for one in Jake's situation. The Attorney General's responsibility over federal prisoners is exercised through the BOP. *See* 18 U.S.C. § 3621(a); *United States v. Wilson*, 503 U.S. 329, 331, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992). The prisoner's first avenue to seek relief is therefore through the BOP's administrative procedures. Under the prior statutory scheme, the district court did not participate in the computation of credit, but could review the BOP's determination after the prisoner exhausted his administrative remedies. *See id.* at 322.

After nearly two years of proceedings in the district court—where Jake was represented by appointed counsel—the parties filed cross-motions for summary judgment which were referred to a magistrate judge for a report and recommendation. On May 1, 1996, the magistrate judge recommended that each motion be granted in part and denied in part. He concluded that Jake was entitled to credit for his federal sentence beginning on July 22, 1988, the day Jake's state sentences were stayed and he was ordered transferred to the federal authorities. Both parties filed objections. On June 21, 1996, the district court accepted the magistrate judge's report in part and rejected it in part, concluding that Jake's federal sentence did not begin to run until January 20, 1989, the day he was physically taken into the custody of the U.S. Marshal. (The government informs us that Jake is scheduled to be paroled on August 21, 1999.)

Jake timely filed an appeal from the district court's judgment and he was appointed counsel. Pursuant to Circuit Rule 51, Jake's appointed counsel filed a motion seeking to withdraw because there was no non-frivolous argument to be made. *See Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). This court granted that motion, and Jake then

---

**3.** Section 2241(c)(3) permits federal courts to issue writs of habeas corpus where a federal prisoner is "in custody in violation of the

Constitution or laws or treaties of the United States."

proceeded *pro se.* The case was originally ordered submitted on the briefs without argument under Circuit Rule 34. But the panel, after examining the briefs, ordered the appointment of amicus counsel to assist the court and ordered further briefing and argument.

### Analysis

The issue we must determine here is when Jake's federal sentence began. He argues that it began June 10, 1985 when he was given a concurrent state sentence. In the alternative, he argues that it began April 10, 1986, the day the California authorities offered Jake to the BOP. The district court held that his sentence began on January 20, 1989, the day he was physically taken into federal custody.

As we said, this case is governed by statutes that were repealed by the Sentencing Reform Act. *See Jackson v. Brennan,* 924 F.2d 725, 727 n. 3 (7th Cir.1991) (for sentences imposed prior to November 1, 1987, prior law governs). The first statute at issue here is 18 U.S.C. § 4082. In its prior form, it provided in relevant part:

(a) A person convicted of an offense against the United States shall be committed, for such term of imprisonment as the court may direct, to the custody of the Attorney General of the United States, who shall designate the place of confinement where the sentence shall be served.

(b) The Attorney General may designate as a place of confinement any available, suitable, and appropriate institution or facility, whether maintained by the Federal Government or otherwise, and whether within or without the judicial district in which the person was convicted, and may at any time transfer

a person from one place of confinement to another.[4]

This statute clearly reposes the authority to designate the place of confinement for federal prisoners in the Attorney General, who may even designate a state facility. *See Montos v. United States,* 261 F.2d 39, 40 (7th Cir.1958) (concluding that under § 4082 "the designation of the place of confinement is *exclusively* for the Attorney General") (emphasis supplied). The second and perhaps most important statute governing this case is 18 U.S.C. § 3568 (repealed). That section provided:

The sentence of imprisonment of any person convicted of an offense shall commence to run from the date on which such person is received at the penitentiary, reformatory, or jail for service of such sentence. The Attorney General shall give any such person credit toward service of his sentence for any days spent in custody in connection with the offense or acts for which sentence was imposed. As used in this section, the term "offense" means any criminal offense, other than an offense triable by court-martial, military commission, provost court, or other military tribunal, which is in violation of an Act of Congress and is triable in any court established by Act of Congress.

If any such person shall be committed to a jail or other place of detention to await transportation to the place at which his sentence is to be served, his sentence shall commence to run from the date on which he is received at such jail or other place of detention.[5]

Thus, this statute established that: (1) a prisoner gets credit for time spent in custody "in connection with" his federal offense; and (2) his sentence begins to run on either (a) the day he arrives at the place to serve his sentence, or (b) the day

---

**4.** This statute, still designated 18 U.S.C. § 4082, has been modified by the deletion of various subsections, including prior (a) and (b) that we have quoted.

**5.** This statute is now codified at 18 U.S.C. § 3585. As the Supreme Court had occasion to discuss, the new provisions are significantly different. *See United States v. Wilson,* 503 U.S. 329, 332, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992).

he arrives at a place of detention "to await transportation" to the place where he will serve his sentence.

Based on the rather straightforward language of these two statutes, the government's argument is equally straightforward. First, it points out that the Attorney General never designated the state penitentiary as the place where Jake's federal sentence was to be served, as he could have. Thus, time spent in the state prison because of a state sentence is not time spent in custody "in connection with" the federal offense and therefore no credit can be given. Similarly, time spent in state prison serving a state sentence is not spent "await[ing] transportation" to the place where his federal sentence will be served. Against this analysis, Jake makes a variety of arguments, which it will be most logical to address in relation to the various dates that Jake (and the magistrate judge) put forward as the appropriate date on which his federal sentence began.

The earliest date Jake argues for is June 10, 1985, the day he received his state sentence, which was to run concurrent with his prior federal sentence. The first bedrock principle that we must recognize in this case is that where an individual has committed crimes against two sovereigns, the issue of who has jurisdiction over him is a matter of comity between the two sovereigns. *Jeter v. Keohane,* 739 F.2d 257, 258 (7th Cir.1984) (citing *Ponzi v. Fessenden,* 258 U.S. 254, 262, 42 S.Ct. 309, 66 L.Ed. 607 (1922)). As to the federal government, the authority to exercise this comity rests with the Attorney General, and an individual may not complain about her decisions. *See Poland v. Stewart,* 117 F.3d 1094, 1098 (9th Cir.1997) ("It is the Attorney General's job to exercise the authority of the United States over federal prisoners. If she chooses to leave [an individual] in the custody of the State ..., neither [the individual] nor this court

is in a position to say she lacks the authority under the Constitution to do so."); *see also Bowman v. Wilson,* 672 F.2d 1145, 1154 (3d Cir.1982) (" '[t]he exercise of jurisdiction over a prisoner who has violated the law of more than one sovereignty and the priority of prosecution of the prisoner is solely a question of comity between the sovereignties which is not subject to attack by the prisoner.' ") (quoting *Derengowski v. United States,* 377 F.2d 223, 224 (8th Cir.1967)) (alteration by quoting court). A corollary to this principle is that a determination as to concurrence of sentence made by one sovereign does not bind the other. A prisoner may not, by agreeing with the state authorities to make his sentence concurrent with a federal sentence, " 'compel the federal government to grant a concurrent sentence.' " *Pinaud v. James,* 851 F.2d 27, 30 (2d Cir.1988) (quoting *United States v. Sackinger,* 704 F.2d 29, 32 (2d Cir.1983)); *see also Del Guzzi v. United States,* 980 F.2d 1269, 1270 (9th Cir.1992) (state judge ordering sentence concurrent with federal sentence and recommending immediate transport to federal authorities has no power to compel federal government to grant concurrent sentence or credit time served in state prison). Indeed, under the prior statutory scheme, we interpreted the authority of the Attorney General to designate the place of confinement of federal prisoners to be broad enough that a *federal* court's determination as to concurrence of a federal sentence with a prior state sentence was not binding on the Attorney General; such a federal sentence was a recommendation to the Attorney General that need not be heeded. *United States v. Aleman,* 609 F.2d 298, 309 (7th Cir.1979); *Montos,* 261 F.2d at 40 (federal court designation that sentence was to be concurrent with prior state sentence was "surplusage" and of no effect); *see also United States v. Myers,* 451 F.2d 402, 403 (9th Cir.1972).[6] Obvi-

---

6. The Sentencing Reform Act altered this rule. Now the concurrence or consecutive-

ness of a federal sentence is established by

ously, then, Jake's first argument must fail. The state court's designation of his state sentence as concurrent with his prior federal sentence created no obligation on the Attorney General to provide him with credit for time served in the state prison. In terms of the provisions of § 3568, the concurrence of the state sentence did not make Jake's custody in state prison "in connection with" his federal offense, nor was he "await[ing] transport" to the place of confinement for his federal sentence.

■■ Jake next argues that his federal sentence should begin to run as of April 10, 1986, the day the state prison authorities offered Jake to the BOP. Under state law, California prisoners who, like Jake, have a state sentence designated to run concurrently with a federal sentence have a right to be tendered by the state authorities to the federal authorities. *See, e.g., In re Stoliker,* 49 Cal.2d 75, 315 P.2d 12 (Cal. 1957); *Isreal v. Marshall,* 125 F.3d 837, 839 (9th Cir.1997). But that state right creates no obligation for the federal authorities to accept the prisoner so tendered. *Smith v. United States Parole Commission,* 875 F.2d 1361, 1365 (9th Cir. 1989) ("the federal government has no duty to take anyone into custody") (citing *Spigner v. United States,* 452 F.2d 1208, 1209 (9th Cir.1971)); *Bloomgren v. Belaski,* 948 F.2d 688, 691 (10th Cir.1991) (where state court intended state sentence to run concurrently with federal sentence and prisoner is offered to federal authorities, "the federal government has no duty to take [such a prisoner] into custody") (citing *Smith*). This is simply another corollary to the principles discussed above: the decision regarding the disposition of federal prisoners—at least under the prior statutory scheme—was given to the Attorney General, and her decisions on the matter were not subject to attack by the prisoner so affected. Again, under the terms of § 3568, the state's tendering Jake did not make his custody in the state prison "in connection with" his federal offense,

nor was he "await[ing] transportation" to the federal penitentiary.

■ Jake argues, however, that we should exercise our equitable powers to alter the result mandated by the statute's plain language because of his circumstances. There is support for the exercise of such equitable power in cases such as *Smith v. Swope,* 91 F.2d 260 (9th Cir. 1937), and *United States v. Croft,* 450 F.2d 1094 (6th Cir.1971). The Fourth Circuit has rejected such an equitable power in the face of the plain statutory language of § 3568. *Thomas v. Whalen,* 962 F.2d 358 (4th Cir.1992). This court has never decided whether such an equitable power exists, and we need not decide it in this case because we see nothing in Jake's circumstances justifying the exercise of the equitable power asserted in *Swope* and *Croft.* Both those cases involved malfeasance by federal authorities, but that is absent in Jake's case. The only error that occurred here was the scrivener's error in the state court judgment. But as we have discussed above, even if the judgment had correctly indicated that Jake was to be transferred to federal authorities, the BOP had no obligation to take him. Moreover, as was demonstrated when the judgment was corrected and Jake was tendered to the BOP, it would not have taken him. And, as we have discussed above, there was no malfeasance in the BOP's decision not to accept Jake into custody.

Jake was able to negotiate a terrific bargain from the state prosecutor so that his sentence for kidnaping and rape could be served concurrently with his prior federal bank robbery sentence. (And he was able to subsequently strike similar bargains for his two convictions for assaulting the deputies.) But it ultimately took four years for the state to take the necessary steps to effectuate that bargain: staying Jake's sentences and "paroling" him subject to the federal detainer. Much of the blame for that delay, however, must fall on

statute in accord with the court's determinations. 18 U.S.C. § 3584.

Jake himself. After the BOP declined to accept him when tendered, it was eight months before his attorney contacted the BOP to verify whether his state time would be credited against his federal sentence. And when he was told it would not, it was nearly eighteen months before the state took the necessary steps to implement its intention. The record is unclear what efforts were being made to bring this about or what exactly caused the delay. But at least seven months of the delay can be attributed to Jake's assaults on the deputies and the charges and plea agreements that followed. So while Jake ultimately had to serve four more years than he may have expected under his bargain as a result of these delays, this is not the sort of inequity that would move us to alter the result mandated by § 3568.

 The final date we must examine is the one the magistrate judge concluded was the beginning of Jake's federal sentence: July 22, 1988, the day his state sentences were stayed and he was ordered delivered to the federal authorities in accord with the previously filed federal detainer. The district court disagreed. The district court noted its dismay that in the two years in which the case was pending, the government had failed to produce any documentation to support its contention that the proper date to begin calculating Jake's sentence was December 15, 1988, the day he was "paroled" to the LA County Sheriff. But the district court concluded that this failure to produce documentation cut against Jake. The court reasoned that Jake's sentence had to begin on January 20, 1989, the day he physically arrived in federal custody, because "there is nothing in the record showing that Jake was actually turned over to the custody of the U.S. Marshal on [December 15, 1988]." Op. p. 12. But the plain language of § 3568 also provides that a prisoner is entitled to credit for time served in custody "in connection with" his federal offense, and that his sentence begins to run when he is in custody "await[ing] transportation" to the

place of his federal confinement, not solely when he physically arrives at his place of confinement. And under § 3568, where a prisoner is in state custody solely by reason of the action of federal law enforcement officials, the state confinement is considered to be federal confinement. *Bloomgren,* 948 F.2d at 690 (quoting *United States v. Winter,* 730 F.2d 825, 826–27 (1st Cir.1984), and collecting cases); *see also Jackson v. Brennan,* 924 F.2d at 728 (interpreting § 3568 so that "credit must be given only when the presentence custody is federal custody or nonfederal custody that was caused by or sustained by the federal government"). " 'Thus if a federal detainer were lodged against a prisoner about to be released from state custody, any days that the state held him beyond what would otherwise have been his release date, to await the arrival of the federal marshal, would be time served "in connection with" his federal offense.' " *Bloomgren,* 948 F.2d at 690 (quoting *Winter*) (emphasis by quoting court omitted).

The *Bloomgren* court also held that where the federal authorities lodged a detainer against a state prisoner who was to be released, the federal government bears the burden of proving that the filing of the detainer was " 'irrelevant' " to the prisoner's continued state custody. *Id.* (quoting *United States v. Haney,* 711 F.2d 113, 114 (8th Cir.1983)). We think the same rule regarding the burden of proof should apply here. We know from the record that on July 22, 1988, Jake's state sentences were stayed and he was ordered transferred to the federal authorities. We also know that on December 15, 1988, Jake was "paroled" to the LA County Sheriff to be so transferred. The district court relied on the record showing that there were proceedings in state court throughout the remainder of 1988. But these state court proceedings also continued until September 1989, when pending state charges against Jake were dismissed. Thus the record is unclear one way or the other whether these proceedings were the reason for Jake's continued state custody.

The government bore the burden to show that its detainer was not the cause for Jake's continued state custody from July 22, 1988, to the time when he was physically transferred to federal custody, and it failed to produce any documentation in support of its case. Therefore, on this record we have to conclude that Jake's state custody during that time was "in connection with" his federal offense or that he was "await[ing] transportation" to his place of federal confinement as those terms were used in § 3568. Therefore, in either case, Jake is entitled to credit on his federal sentence from July 22, 1988. We express no opinion about how this case would be decided under the current statutory scheme.

The judgment of the district court is therefore REVERSED, and the case is REMANDED with the instruction to issue the writ consistent with our opinion.